By the Court—Hoffman, J.
The question is, whether the tender of the premium on the 29th of June, 1856, being Monday, was sufficient to keep the policy in force. That question will be first considered, upon the terms of the policy merely, irrespective of the letter of the agent and other facts.
1. By one clause of the policy, it is provided that the yearly premium for such assurance is $65.40, and that the said Daniel Campbell hath paid the sum of $65.40, being the annual premium for such insurance, to wit, for the term of twelve months, ending the 28th day of May, 1851.
In the margin of the policy are these words: “ Risk commencing 29th of May, 1850, ending 28th of May, 1851.”
Thus twelve months is computed as beginning on the 29th, and terminating with the end of the 28th of May.
Treating, then, the time for payment of the premium as exactly commensurate with the duration of the risk, if a premium was paid on the 29th, the risk endured until the last moment of mid night of the 28th of the same month, in the ensuing year, and the new premium ought to be paid before the end of the last moment of the 28th.
But then is added this provision: “The policy will not be considered in force, if the premium remains unpaid beyond thirty days after becoming due.” We may properly say conversely, that the policy shall remain in force, if the premium is paid within thirty days after becoming due.
Upon these terms used by the parties, the premium undoubtedly became due at the endof the 28th of May. The first day of the thirty days for making the payment commenced with the first moment of the 29th of May, and ended with the last moment of the 27th of June. In the year 1857, this fell on Saturday; and in this view, the full thirty days allowed for the payment expired with the end of Saturday. That was the last day for performance of the engagement, and the tender on Monday could not be good.
This computation, it will be noticed, includes both the 29th of May and the 27th of June. The day when the premium became due was the 28th of May, and that is excluded. There is no rule which would also exclude the 27th of June.
*310 The Revised Statutes (1 R. S., 606,) provide for the computation of time; and it is observed by the court in Pulling v. The People, (8 Barb. R., 384,) that according to this division of time, a day consists of twenty-four hours, and commences and ends at midnight. <>
This, then, is an adoption of the natural day, as distinguished from the artificial day from sunrise to sunset. (Id.) The first day of any number of days for doing an act, would not expire until the lapse of twenty-four hours from any moment, even the first second of that day. It would expire on the corresponding moment of the second day. This seems to produce the same result as the rule of excluding the first day in computing the time for doing an act.
The Code (§ 407) directs that the time within which any act is to be done, within its provisions, shall be computed by excluding the first day and including the last. If the last day be Sunday, it shall be excluded. It has, therefore, furnished a definite rule for all cases within its own provisions.
There is no way of regarding the question, if we treat the premium to have been due on the 28th of May, which will not make the thirty days end on Saturday, the 27th of June.
2d. We are then to consider the point, whether there is not enough in the case to warrant the conclusion that the 29th of May was, by consent, the true day for payment of the premium.
The policy was dated the 29th of May. The first premium was paid on the 31st of that month, and the premium was paid annually in advance up to the 29th of May, 1857. The general agents informed the party that the premium would be payable on the 29th of May, by the note stated in the case. This note appears to have been conformable to the understanding and practice of the parties.
Again, the note of the general agents was sufficient to justify the assured in treating the 29th as the time when the premium was payable. It was their construction of the effect of the agreement, or of the habit under it, if it was not fully within their authority to vary the day. It justified the party in relying upon that representation, coming from those who were entitled to make a contract of insurance, and acting as the general agents in the United States.
*311 Starr, as general agent, possessed the power of binding the association to an insurance. Whether a full policy was obtained within three months or not, his contract was sufficient.
In Wing v. Harvey, (27 Eng. & Eq. L., 140,) an agent of a company received a premium, knowing that the condition of a life policy had been broken. His knowledge was held to be constructive notice to the company of the breach, and acceptance of the premium was a waiver of the forfeiture.
Leeds v. The Mechanics' Insurance Company, (4 Seld., 351,) is a case which, I think, supports this view of the power of the general agents in this instance.
See, also, Brocklebank v. Sugrue, (5 Carr. and Payne, 21,) New York Central Insurance Company v. The National Prot. Insurance Company. (20 Barb., 468.)
I think we are justified in saying that the 29th of May was the true day for payment of the premium in 1857.
If this conclusion is right, the next inquiry is, can the 29th of May be excluded from the computation of the thirty days ? If it may be, then the thirty days expired on Sunday, the 28th of June; and the remaining question will be, had the assured the ensuing Monday on which to pay the premium ?
Besides the rule given in the Revised Statutes of 1830,. construed as before stated, I think that the cases of. Wiggin v. Peters, (1 Metc., 127,) Bigelow v. Willson, (1 Pick., 485,) Sands v. Lyon (18 Conn., 18,) Lester v. Garland, (15 Ves., 243,) and of Dowly v. Foxall, (1 Ball & Beatty, 193,) with the authorities there cited, are decisive to sustain an answer in the affirmative to the first question. The Court, in the case from Connecticut reports, justly commends the opinion of Sir William Grant, in Lester v. Garland, as the most instructive and able of any to be found in the books. That eminent judge says “that it would be more easy to maintain, as the general rule, that the day of an act done, or an event happening, ought, in all cases to be excluded, than any other rule.” In other authorities, this general rule is made applicable to the case of an obligation arising on a particular day, and its performance extended from that day.
So the Court in Massachusetts observe: “ we are warranted in saying, that when time is to be computed from or after the day of a given date, that day is to be excluded in the computation. No *312 moment of time can be said to be after a given day until that day has expired.”
The contract, as we now analyze and construe it, was, that the policy should cease to be in force if the premium remained unpaid beyond thirty days after the 29th of May.
3d. Then arises the important question. As by this mode of computation the. last day of the thirty days was Sunday, could the tender of the premium be made on Monday ?
The argument which is used to prove that it cannot be, is substantially this: 1st. Whatever may be lawfully done on any other day of the week, may be done on Sunday, except so far as positive statutory regulations have prohibited a particular act. And next: What is so permitted to be done on Sunday, must be done on that day whenever, under a contract, the day for fulfillment falls upon it, or else it must be done before that day. I state this to be the substance of the argument as a general proposition ; not that it is contended that such a rule is absolutely exceptionless.
These important and interesting propositions may well warrant a careful examination.
In support of this view, my brother Pierrefont (who does not concur with the court) has referred to the opinion of Lord Mansfield, in Swann v. Broome. (3 Burr., 1596.) That great judge cited Sir Henry Spelman’s (Original of the Terms) to show “ that the Christians used all days for the hearing of causes, not sparing (as it seemeth) the Sunday itself.” He assigns as one reason of this, that by keeping their courts always open, suitors would be prevented from resorting to the heathen tribunals.
He cites also a canon of the year 517, forbidding any Bishop or any one under him, from judging causes on the Lord’s Day, and traces the regulation through other canons, until it became incorporated into the body of the canon law in the Code of Oratian. He states further, that it became part of the common law of England, by its confirmation by William the Conqueror and Henry the Second.
If such a practice existed, it was, as I shall clearly show, checked at a far earlier period than the year 517; and it seems to me there exists a much more satisfactory and probable reason for its prevalence for a short period, than the one assigned. *313 There was an apostolic injunction that the controversies between the faithful should be left to the decision of some among themselves, and should not be brought before the tribunals of the heathen. (1 Cor. vi, 1-7.) The rule of judgment was to be one of persuasion, charity and forbearance; and it may well have been thought, that the holy day was not desecrated when litigants were brought to reconciliation or atonement by influences like these.
It is obvious that a scriptural custom, so benign in the early days of Christianity, could not remain without danger and inconvenience, when the ecclesiastical tribunals had nearly superseded the secular courts; and, as we may justly infer, the superior purity of the principles of the decisions, and the higher learning and equity of the administrators, made the people sustain and court them. (See Van Espen Jus. Eccl. Univ., p. 730-733, XXVIII.)
The canon of A. D., 517, referred to by Lord MANSFIELD, was not the earliest law upon this subject. Oonstantine the Great passed an edict, the date of which I have not ascertained, but it was between the year 306, the time of his conversion, and 331, that of his death. It may be thus translated: "Let all judges, and the inhabitants of cities, and the labors of all trades and arts, rest on the venerable day of the Sun." [1]
So, in an edict of Valentinian the younger, between A. D. 375 and 392, we find, “ On the day of the Sun, which our forefathers rightly called the Lord’s Day, let attention to all litigations, to all employments, and to all agreements, utterly cease; let no one demand either a public or a private debt; nor let cognizance be had of any disputes before those who are to determine, whether appointed by law or voluntarily’ chosen.[2]
The translation I havé given differs from that of the learned Bingham. (Antiquities of the Christian Church, Book XX, ch. *314 2, § 2.) For one important word, conventionum, translated, “ agreements,” I have the authority of Ulpian. (Digest, lib. 2, tit. 14, L. 1.) It is a general word relating to all things, in respect to which parties come together for contracting or transacting any business. See, the passage, also, in the Dictionary of Forcellini ecc cum Facciolati, in verlo.
'The Day of the Sun, Dies Solis, was used at a very early period as synonymous with Dies Dominions, the Lord’s- Day. It is spoken of by Justin Martyr, A. D. 140-148, as the Day of the Assemblage of Christians, and the Day of the Eesurrection. Dfam Dominicum is the phrase of Tertullian, before A. D. 218, and of Ignatius, before 107, whose acts are traced to the year 70. A late writer says: “ It was sometimes called Sunday, Dies Solis, in compliance with the common phraseology, and when it was necessary to distinguish it in addressing the heathen.” (Eiddle’s Christian Antiquities, p. 649-651; Pearson on the Creed, 391, n.)
In the beginning of the Diocletian persecution, (A. D. 303,) the magistrate asked, “ Have you kept the Lord’s Day ?” to which the Christian answered, “I cannot intermit it, because I am a Christian.” (Act. Martyr Barronius Ann., 303, n. 37.)
The 20th canon of the Council of Nice (A. D. 325) uses the Greek word, which is uniformly translated Dominicum or Lord’s Day, designating the day of the resurrection. The 29th canon of Laodicea (A. D. 305) provides “ that Christians must not Judaize. and rest on the Sabbath Day; but work on that day, and honor the Lord’s Day; and if they can, rest upon it as Christians.”
I cannot but add, that the argument of Bishop Pearson, as to the day of. the resurrection—the principal texts he cites (St. Mark, xvi, 2; St. Matthew, xxviii, 1; St. Luke, xxiy, 1; and St. John, xxi,) with the phrase, the Lord’S Day, used in Scripture (Eev. i, 10,)—the practice of assembling there recorded (1 Cor. xvi, 2), and the usage of Christians traced back to such remote antiquity, constitute an argument of irresistible force, to prove that the Jewish Sabbath was superseded; that the day of the resurrection was substituted, and that the great injunction of the ancient law to keep it holy, was applicable to this new day of a greater deliverance. Ecclesiastical history is uniform to show that its observance as a rule for all who profess themselves Christians, *315 has been recognized and transmitted by the practice of apostles, the obedience of disciples, the recognition of canons, and the edicts of emperors, monarchs and states, from the earliest rise of Christianity through all the ages of its progress.
It would not be pertinent to pursue this inquiry further, except to remark, that in the early edicts, personal labor, and especially the labor of the field, seem to have been treated as less the objects of prohibition than in later days, when they have been chiefly aimed at. (Van Espen, ut supra.)
Coming down to the law of our English progenitors I cannot but dwell for a moment upon the rules laid down in the Liber PenitentiaMs of Theodore, Archbishop of Canterbury, between the years 668 and 690. (Ancient Laws and Institutes of England, published by the Record Commission of 1840, p. 298, XXXVIII, 6, 14.) It made a part of the general law of England, and was full, minute and comprehensive in its prohibitions.
Even before this, in the year 547, a Saxon King, Ida, had declared that the slave who was compelled to work on the Lord’s Day should be freed by his master.
So Lynwood, in his Provincial Constitutions, (p. 57, Ganonicis Institutes,) states the law thus: Abstinenduen est ab operis mechanicis, ah agricultura / a mercatis, et a placitis ; et hoc verum nisi guando contrarium exegit necessitas vel pietas.
One of the earliest statutes of England was that of the 27th Henry VI, (ch. 5.) Persons were commanded, at all fairs and markets to cease from showing goods on Sundays. The statute (5 and 6 Edw. VI, ch. 3,) recites in its impressive language, that “ to call men to remembrance of their duty, and to help their infirmity, it hath been wholesomely provided, that there should be some certain times and days appointed wherein the Christian should cease from all other kinds of labors, and should apply himself only unto the holy works properly pertaining unto true religion and after various enactments as to the days to be kept holy, and other matters, provides, in the 7th section, that it should be lawful for every person in harvest, or at any other time in the year when necessity shall require, to labor or work any kind of work on such days.
The act of 1st Car. I, ch. 1, prohibited assemblages of people out of their parishes on that day. That of the 3d Car. I, ch. 1, *316 forbade carriers and waggoners from traveling on the Lord's Day, and butchers from killing; and the statute of the 29th of Car. H, ch. 27, in force to this day, provided, “ that no tradesman, artificer, workman, laborer, or other - person whatsoever, should do or exercise any worldly labor, business or work of their ordinary calling, upon the Lord’s Day, or any part thereof, works of necessity or charity only excepted, and no person shall publicly cry, show forth, or expose to sale, any wares, merchandise, &c., upon pain of forfeiture thereof.”
In our own legislation on this subject, it is to be noticed that the present statute, (1 R. S., 675, § 59,) omits the enumeration of persons, tradesmen, workmen, or other persons whatsoever, as well as the words “ of their ordinary calling.” It is as follows, “Nor shall there be any servile labor or working on that day except works of necessity or charity, or unless done by some person who uniformly keeps the last day of the. week called Saturday as holy time, and does not labor or work on that day, and whose labor shall not disturb other persons in the observance of the first day of the week as holy time.”
I consider that this provision treats “servile labor” as one distinct class of what is forbidden, and “ working,” without the adjective, as another; that it has adopted the latter phrase as the most comprehensive that the language can supply to cover the action and employment of mind or body in the pursuits of business. It explicitly recognizes the first day of the week as “ holy time.” And thus it has brought us back to the full, enlarged and absolute rule of interdiction, which we find prevailed in the earliest laws of Christian states, and which, as I shall show, the construction of the statute of Charles II has tended somewhat to narrow and impair. ,
Among the English authorities, Bloxsome v. Williams, (3 Barn. & Cress., 232,) is frequently cited, as well as Drury v. Delafontaine. (1 Taun., 131.) It was held in one of them that the sale- of a horse on Sunday, by private contract, ,the ordinary calling being to sell horses at auction, was not within the statute. But in Fennell v. Ridler, (5 Barn. & Cress., 406,) Justice Bailey, who in Bloxsome y. Williams doubted whether the statute applied to private sales, observed, that such doubt was removed. “ Labor may; be private and not meet the public eye, and so not offend *317 against public decency, but it is equally labor, and equally interferes with a man’s religious duties.” He adds, that in truth the contract in Bloxsome v. Williams was made on Tuesday. In the principal case, a sale of a horse, by a horse dealer, privately made on Sunday, was held void.
In The King v. The Inhabitants of Whitnash, it was decided that if a sale or a contract is not in the line of a man’s ordinary calling, it is not within the prohibition of the statute. (7 Barn. & Cress., 596.)
Our own statute has received a construction in the following cases: Story v. Elliott, (8 Cow., 27,) Sayles v. Smith, (12 Wend., 57,) Boynton v. Page, (13 id., 425,) Watts v. Van Ness, (1 Hill, 76,) Delamater v. Miller, (1 Cow., 75,) Bissell v. Bissell, (11 Barb., 96,) ex parte Dodge. (7 Cow., 147.)
In Delamater v. Miller, upon an agreement to keep and deliver a watch, the promisor was held not bound to regard a demand made on Sunday- Story v. Elliott was the case of an award made on Sunday, and held void. Swann v. Broome, before Lord Mansfield,, is stated at length. The opinion contains the proposition, that acts not prohibited, may lawfully be done on Sunday.
In Sayles v. Smith it was decided that a statutory foreclosure was not void, because the day for the sale specified in the advertisement fell on Sunday. A postponement to a subsequent day was held valid. It is queried whether a sale on that day could have been good. Again the doctrine is stated, that what is not forbidden by statute may legally be done.
In Boynton v. Page it was determined that a private transfer of personal property made on Sunday was valid, and the distinction before noticed in some of the English cases was approved and acted upon, that there was no violation of the public order and solemnity of the day.
Watts v. Van Ness was the case of an attorney’s clerk, engaged at a weekly salary, doing extra work on Sunday, similar to that of his ordinary calling. It was held that he could not recover.
Bissell v. Bissell and ex parte Dodge were' decided upon the ground that, in the construction of statutes of our State, if the last day for doing the act falls on Sunday, it must be done on the preceding day. Judgment, therefore, which must be ren *318 dered by a Justice within four days after the submission of the cause, could not be entered on Monday, the fourth day being Sunday, but must be on Saturday. And so in the case of an appeal, the period being limited by statute.
Yielding to the force of what has been actually decided, we cannot but notice a marked line of distinction between what is suffered being not positively prohibited, and what is allowed to be omitted and deferred, because at variance with the principles and law of Scripture, because as much within the object of the statute, “the observance of Sunday,” as anything expressly prohibited, and because in some cases it is clear, and in others may be-inferred that contracts are made into which the law imports the qualification, and the parties are treated as entering into them with' that in view, that if the day of performance is Sunday, it may be done on some other day. ' We shall endeavor to see if such a principle, applicable to the present case, can be deduced from the authorities.
It is a settled doctrine of mercantile law, that a promissory note or bill must be demanded on the third day of grace, unless that falls on Sunday, and then upon the second day, or Saturday. (Bussard v. Levering, 6 Wheat., 102; Jackson v. Richards, 2 Caines, 342; Johnson v. Mathews, 13 John. R., 470.) .But if a check or note is without grace, and it falls due on Sunday, the party has Monday to make payment. (Salter v. Barl, 20 Wend., 205.)
The usage in regard to the days of grace is as old as the time of Lord Holt. (2 Caines, 344.) The contract, by such usage, so established as to be part of it, is to be fulfilled on a given day, which falls upon Sunday. The law interposes and says that it cannot be, or at least need not be performed on that day. It shortens the time of performance, and not merely requires payment on Saturday, but sustains notice of protest given on Monday. (2 Caines, 344; Cuyler v. Stevens, 4 Wend., 566.) “By general or universal custom, Sunday is not a day of business.” (See, also, Howard v. Ives, 1 Hill, 263.)
For a long time the Courts held, and finally embodied the decision in general rules or orders, that in all matters of practice, when a time was fixed for performance of an act, or the giving of a notice, and the time expired on Sunday, it could be done *319 on the ensuing Monday. (Cock v. Bunn, 6 Johns. R., 326; Broome v. Wellington, 1 Sandf. S. Ct. R., 664; Bissell v. Bissell, 11 Barb. R., 96.)
The rule was stated in unqualified language by Justice Brow-sou in Salter v. Burt. (20 Wend., 205.) “ I agree to the doctrine laid down by Gould, J.,” (in Avery v. Stewart, 2 Conn. R, 69,) “ that Sunday cannot, for the purpose of performing a contract, be regarded as a day in law, and it should for that purpose be considered as struck from the calendar. In computing the time mentioned in a contract for doing an act, intervening Sundays are to be counted; but when the day of performance falls on Sunday, it is not to be taken into the computation.”
In Avery v. Stewart, (2 Conn. R., 69,) the Court (six Judges to three) held that when a contract was to be performed on a particular day of a month in future, and that happened to be Sunday, it was to be performed on the following day. The action was on a note not negotiable, payable in sixty days from date, in cotton yarn, to be delivered at a certain place. It was dated the 6th of December, 1816, and fell due the 4th of February, which was Sunday. On Monday, what was equivalent to a tender of the yarn was made. The debtor could not be required to pay, nor the creditor to accept payment before the time appointed.
The case of Sands v. Lyon, (18 Conn. R., 18,) "is an authority which covers the point fully and decisively. A testator devised lands to his son, on condition that he should pay A. $100 in one year after his decease. He died on the 2d day of October, 1841. The 2d day of October, 1842, fell on Sunday. A tender on the ensuing Monday was held good. The day of the death was to be excluded from the computation. By doing so, the day of the expiration of the year would be Sunday. The defendant had a full year allowed him for paying the money, and was not bound to pay it on the Saturday preceding the day on which the year expired.
It appears to me, from this review of the law, that the Court is warranted in saying that when, from accident or mutual error, the day of fulfilling an agreement falls upon Sunday, there is enough of principle and authority to justify the party in deferring *320 his performance to the Monday ensuing, without impairing a right, or incurring a forfeiture.
The judgment must be for the plaintiff.
Pierrepont, J,, dissented.
Judgment for plaintiff.

 Solis die quern Eominicum rite dixere majares, omnium ommnino litium negotiorum, conventionum, quiescat intentio / debiiimi publicsm privatvmve nullus efflagiiet'; ne apud ipsos quidem arbitros vel in judiáis flagitatos, vel sponte dilectos sida sit agnitio jscrgiorum.